# 2020 WI App 51

## COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2019AP548-CR

† Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**KEITH C. HENYARD,**

**DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | July 8, 2020 |
| Submitted on Briefs: | February 27, 2020 |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Reilly, P.J., Gundrum, J. |
| Concurred: | |
| Dissented: | Reilly, P.J. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher W. Rose* of *Rose & Rose,* Kenosha. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sara L. Shaeffer*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

**2020 WI App 51**

**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 8, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

| Appeal No. | **2019AP548-CR** | Cir. Ct. No. 2016CF1401 |
|---|---|---|
| **STATE OF WISCONSIN** | | **IN COURT OF APPEALS** |

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

KEITH C. HENYARD,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Kenosha County: BRUCE E. SCHROEDER, Judge. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶1 GUNDRUM, J. Keith Henyard appeals from a judgment and an order of the circuit court. He claims the court erred in denying his postconviction motion to withdraw his plea. This is so, he argues, because his Sixth Amendment right to

the effective assistance of counsel was violated because his counsel, Frank Parise, had an "actual conflict of interest" due to previously presiding as the court commissioner over a hearing in this case, at which hearing Parise accepted Henyard's waiver of his right to a preliminary hearing, found probable cause to believe Henyard had committed a felony, and bound him over for trial. Henyard alternatively claims the court erroneously exercised its discretion in denying his motion for resentencing, which motion was based upon Henyard's contention that the court was biased "against heroin and/or drug delivery offenses," the type of offenses for which Henyard was sentenced in this case.

¶2    We reject Henyard's request for plea withdrawal as he has failed to demonstrate that Parise had an actual conflict of interest that adversely affected his performance and thus failed to show that Parise performed ineffectively. On the second issue, we hold that the circuit court did not err in denying Henyard's motion for resentencing because Henyard failed to rebut the presumption that the court was fair, impartial and without prejudice. We affirm.

*Background*

¶3    Henyard was charged with four counts of delivering cocaine, one count of possession of cocaine with intent to deliver, two counts of delivering heroin, and one count of possession of heroin with intent to deliver, all as a repeater. On December 28, 2016, he appeared in person and with counsel at a hearing before Court Commissioner Parise, at which hearing Henyard waived his right to a preliminary hearing and, based solely upon the complaint, Parise concluded there was probable cause to believe Henyard had committed a felony and bound him over for trial.

¶4 In May 2017, Henyard retained Parise as counsel in this case. Parise thereafter represented Henyard through his plea and sentencing.

¶5 At an August 7, 2017 pretrial hearing, the circuit court[1] considered increasing Henyard's bond due to the filing of new criminal charges against Henyard. Representing Henyard, Parise argued against the bond increase, noting that Henyard had "made every appearance" in the case. The court nonetheless increased the bond, explaining that it had considered Henyard's good record of appearances, but:

> I'm faced with the fact that he has a history of convictions for violence, although they have been reduced in stature by the district attorney, but he has gone down on convictions for personal violence against women before, and he is accused now while he was out on bond in this case of threatening to kill a woman and battering her and I think breaking a couple of bones, and so I'm very uncomfortable with that, given the severity of the charges, and *there has been some recent publicity about my thoughts about dealing heroin, too, so that—that would give the defendant an additional incentive to fail to appear* ….

(Emphasis added.)

¶6 A plea deal eventually was struck, and Henyard pled to one count each of delivery of cocaine, delivery of heroin, possession of cocaine with intent to deliver, and possession of heroin with intent to deliver, all as a repeater, with the other four counts being dismissed but read in. The court sentenced Henyard on the delivery-of-heroin count to twelve years of initial confinement followed by five years of extended supervision. On the remaining three counts, the court withheld sentence and ordered probation.

---

[1] The Honorable Bruce Schroeder presided over all hearings referred to in this decision other than the December 28, 2016 hearing over which Frank Parise presided. Specific references to court or judge in relation to this case are references to Schroeder.

¶7  As part of its explanation for the sentence, the circuit court began by referencing a report from a medical examiner in Milwaukee County indicating that in a recent four-day period "11 people died in Milwaukee County from heroin overdose." The court stated, "[W]e have got a lot of heroin out on the streets, and … there is an economic incentive for people to traffic in this stuff, and so we need to do some things to protect people…. [T]here needs to be a message loud and clear about how unacceptable this kind of behavior is." The court added that it is "simple economics" that "you have to make the activities that you don't favor not worth the risk. If you impose serious, severe penalties on unacceptable behavior and you aggressively enforce the laws, you'll reduce it, and that's what happened in Singapore, which is one of the safest places in the world" because "people who are actually selling drugs suffer" the death penalty. The court also talked about a time in Kenosha when there were judges who believed in very stern sentences for drug dealers and that, in part because of this, "there was a period in the early '90s when you couldn't get heroin in Kenosha.… The dealers had all just left. They didn't want to get involved with what was happening." The court stated that crime is not deterred with light sentences; "if there is big money … people will run that risk, number one, that they won't get caught, and number two, that if they do get caught, they'll get some wimpy sentence."

¶8  The circuit court continued:

> Stern sentences, aggressive enforcement drive drug dealers underground. What does that do? That means less young people get involved with heroin in the first place because they can't get it, and if it is available, they can't afford it because the dealers raise their prices—those who still want to do the business—because basic economics—the reward has to outweigh the risk, and so that deters drug use.
>
> …. [I]t discourages [heroin] use [by casual users], and so stern sentences can be … one of the most effective ways of

4

> dealing with the heroin problem, and we … had better do something because this is just frightening what's going on.

The court expressed further concern for "the number of people who lose their lives to heroin overdoses" and told Henyard he "ha[d] to pay the price for this to be an example to you and to people who know you, to your friends, to people who casually know you, your customers, your providers." The court added that Henyard's case was "aggravated" because he was "a woman beater, too" and further expressed that Henyard's "$80,000 child support arrearage" was "disgraceful."

¶9     Following sentencing, Henyard filed a postconviction motion seeking plea withdrawal or, alternatively, resentencing. As to plea withdrawal, he claimed Parise ineffectively represented him because Parise had a conflict of interest during the representation due to earlier serving as a court commissioner in the case and in that role presiding over Henyard's preliminary hearing waiver, finding probable cause to believe he had committed a felony, and binding him over for trial. Related to his alternative request for resentencing, Henyard argued that the sentencing judge, Bruce Schroeder, was biased against defendants like him who are convicted of delivering heroin or other drugs.

¶10     Parise was the only witness to testify at the postconviction hearing. He testified that when he met and began representing Henyard in May 2017, he did not recognize Henyard "at all"; he believed he had done a conflict check before agreeing to represent Henyard but he did not "catch" that he had presided over the December 28, 2016 hearing; and he did not become aware he had presided over that hearing until he received a letter from Henyard's postconviction counsel in August 2018, a year after Henyard entered his plea. Following testimony, the circuit court asked postconviction counsel, "What did Mr. Parise do that was in any way

compromising his representation?" Counsel responded: "Well, I don't know that I can say specifically."

¶11 The circuit court stated that while Parise's representation of Henyard in the same case in which he had previously served as a court commissioner "shouldn't have happened," Parise had "made a mistake." The court added that despite that mistake, "there is absolutely no reason to believe there has been any compromise of [Henyard's] interests … they have not been in any way affected."

¶12 As support for his request for resentencing, Henyard submitted local newspaper articles related to comments Schroeder purportedly made at the sentencing hearings of other defendants prior to Henyard's August 7, 2017 pretrial hearing. Those articles quoted Schroeder as stating that people who commit the "grave crime" of first-degree reckless homicide for delivering drugs which caused someone's death (a crime of which Henyard was *not* convicted) "have to suffer severe loss" and reported that Schroeder said he "believed that long prison sentences can deter others from selling heroin" and showed admiration for the effectiveness of Singapore's policy of applying the death penalty in drug trafficking cases. *See* Deneen Smith, *Judge Hopes Stiff Sentence Can Deter Opioid Abuse*, KENOSHA NEWS (Mar. 18, 2018), https://www.kenoshanews.com/news/local/judge-hopes-stiff-sentence-can-deter-opioid-abuse/article_792fec61-4778-515b-84a0-9cca35d1bab7.html; Deneen Smith, *12 Year Prison Sentence for Man Connected to Drug Overdose Death*, KENOSHA NEWS (July 21, 2017), https://www.kenoshanews.com/news/local/12-year-prison-sentence-for-man-connected-to-drug-overdose-death/article_945d95f9-d87b-5294-a309-3b520e1a6777.html. The articles also identified Schroeder as stating that "the key to addressing the growing opiate problem—and drug problems in general—is to put more people in prison," "the war

6

on drugs needs to be fought more aggressively," and "I pray to God that it will and that lives will be saved." *Id.* Henyard's postconviction brief also pointed to the August 7, 2017 hearing at which Schroeder increased Henyard's bond and in doing so made reference to (presumably) these newspaper articles in stating that "there has been some recent publicity about my thoughts about dealing heroin, too, so that-that would give the defendant an additional incentive to fail to appear."

¶13 In an attempt to clarify Henyard's resentencing argument, Henyard's postconviction counsel indicated at the hearing that Henyard was not arguing that Schroeder's comments in the newspaper, or thoughts generally, about defendants who deliver heroin or other drugs indicate Schroeder is biased in all such cases, but that Schroeder had exhibited bias against Henyard specifically with the "recent publicity" comment Schroeder made at the August 7 pretrial hearing.

¶14 Ruling on the postconviction motion, Schroeder stated:

> [I]f I'm required by law as I am to state the reasons which cause me to impose a particular sentence, if the most important driving factor to me is a desire to be very harsh with drug offenders who are selling these lethal drugs that are killing increasing numbers of people … and that's what the defendant was doing, was selling drugs that kill people, and so if my purpose in sentencing people was to communicate to the public how severely this needs to be handled, I was only complying with what the Supreme Court had required all along.

Specifically related to the comments he made at the August 7 hearing, Schroeder stated: "I have to give my reasons when I change people's bonds ... So I was explaining why I thought he was a flight risk .... [W]hen you get an article like this in the paper, it does give someone incentive to blow town, so that was my observation." Schroeder denied both parts of Henyard's postconviction motion, and Henyard appeals.

***Discussion***

¶15    Similar to his prior arguments, on appeal Henyard claims he is entitled to plea withdrawal because his counsel was ineffective or, alternatively, to resentencing because Schroeder was biased against him and prejudged his sentence. He fails to persuade.

<u>Ineffective Assistance of Counsel</u>

¶16    The right to the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution "contemplates the services of an attorney devoted solely to the interests of his [or her] client." ***State v. Street***, 202 Wis. 2d 533, 541, 551 N.W.2d 830 (Ct. App. 1996) (citation omitted). Thus, a defendant is entitled to representation that is "free from conflicts of interest." ***Id.*** To show that a defendant's right to effective counsel has been violated based upon a conflict of interest, a defendant who, like Henyard, failed to raise an objection during his criminal proceedings "must demonstrate by clear and convincing evidence" that his counsel "was actively representing a conflicting interest, so that the attorney's performance was adversely affected." ***State v. Love***, 227 Wis. 2d 60, 71, 594 N.W.2d 806 (1999). When the facts are not in dispute, as is the case here, whether those facts establish a violation of a defendant's right to the effective assistance of counsel is a question of law we review independently. *See* ***id.*** at 67.[2]

---

[2] It is important to note that our task on review is to determine the validity and lawfulness of Henyard's conviction and whether he should be permitted to withdraw his plea. We do not have before us a challenge to Parise's conduct under the Wisconsin Code of Judicial Ethics.

¶17     Henyard does not clearly spell out exactly how Parise's interests were actually conflicted due to serving as court commissioner at the December 28, 2016 hearing and then later serving as his counsel in the same case.[3] Recognizing that Wisconsin cases require a showing that Parise actively represented a conflicting interest, Henyard suggests that because Parise, while serving as court commissioner, made the probable cause finding and bound Henyard over for trial, he then had an incentive while subsequently serving as Henyard's counsel to have Henyard found guilty, so as to prove correct his earlier probable cause finding and bind over decision.  The facts do not bear this out.

¶18     Parise testified at the postconviction hearing that he believed he had performed a conflict check before agreeing to represent Henyard in this case but he simply did not "catch" that he had presided over the December 2016 hearing.  He further testified that when he began representing Henyard in May 2017 and throughout his representation, he had no recollection or other awareness that he had previously served as court commissioner at the December 2016 hearing.  This testimony was undisputed at the postconviction hearing and is unchallenged on appeal.  Although the postconviction court did not go into detail, it accepted the

---

[3] The circuit court observed the same shortcoming during the postconviction hearing:

> [THE COURT:]  [W]here is there anything that would even be potentially inimical to the interests of the defendant?
>
> To me, that is the core of what's a conflict of interest is where there is reason to believe that the attorney's representation of the client is infected in some way.  What am I missing?  Where is it?  What did Mr. Parise do that was in any way compromising his representation?
>
> [Counsel]:  Well, I don't know that I can say specifically, but I think the point that is being missed is that, number one, the acting as the court commissioner and presiding over that same case is where the actual conflict exists.
>
> THE COURT:  Well, no.  You are saying well, it is a conflict because it's a conflict.

9

credibility of Parise's testimony, finding that he had made a "mistake." The court did not question Parise's testimony that throughout his representation of Henyard, Parise was unaware he had previously presided over the December 2016 hearing, made a probable cause finding against Henyard, and bound him over for trial. *See State v. Martwick*, 2000 WI 5, ¶31, 231 Wis. 2d 801, 604 N.W.2d 552 ("[I]f a circuit court fails to make a finding that exists in the record, an appellate court can assume that the circuit court determined the fact in a manner that supports the circuit court's ultimate decision.").

¶19 Because Parise was at no relevant point aware he had presided over that hearing and made the probable cause finding and bind over decision, and Henyard has suggested no other way in which simply having served as court commissioner at that hearing could have adversely affected Parise's representation of him, we must conclude Henyard has failed to demonstrate by clear and convincing evidence that Parise had an actual conflict of interest that adversely affected his representation. *See Street*, 202 Wis. 2d at 542. Simply put, as to Henyard's specific, presumed argument on appeal, Parise's prior service as a court commissioner could not have provided him with an incentive to have Henyard found guilty in the case if Parise was unaware he had presided over that hearing and made

that finding and decision. Assuming there was a potential conflict, it never became an actual conflict that adversely affected his representation.[4]

¶20 While we could end our discussion of this issue there, we further note support from **Love** and **Street**.[5] At his sentencing after revocation, Love was represented by counsel who had previously served as a prosecutor at Love's original sentencing, although during counsel's representation of Love, she did not recall having done so. **Love**, 227 Wis. 2d at 63, 65, 78. Our supreme court held that where a conflict is raised for the first time postconviction, as in Henyard's case, a defendant must show more than a potential conflict of interest; rather, he or she must demonstrate by clear and convincing evidence that counsel "was actively representing a conflicting interest, so that the attorney's performance was adversely affected." **Id.** at 71. The court recognized that had counsel been aware of her opposition to Love at his original sentencing she would have potentially violated two different Wisconsin Supreme Court Rules by subsequently representing him in

---

[4] We note too that unlike many conflict of interest cases, Parise did not previously function in this case as an *advocate* opposed to Henyard; rather, Parise served as a neutral magistrate who found, based solely upon the complaint, that there was a "believable and plausible account" that Henyard committed a felony—a far cry from the beyond a reasonable doubt standard needed for a conviction. *See State v. Anderson*, 2005 WI 54, ¶64, 280 Wis. 2d 104, 695 N.W.2d 731 (citation omitted). Because Parise did not previously function as an advocate opposed to Henyard, this is not a case of "serial representation," which occurs "when an attorney represents one party in a case, then switches sides to represent the other party in the same proceeding or in an unrelated case." *See State v. Love*, 227 Wis. 2d 60, 73, 594 N.W.2d 806 (1999).

[5] Henyard relies heavily upon *United States v. Ziegenhagen*, 890 F.2d 937 (7th Cir. 1989), a federal court decision predating both *State v. Street*, 202 Wis. 2d 533, 551 N.W.2d 830 (Ct. App. 1996), and *Love*, 227 Wis. 2d at 60. Because we are bound to follow state court precedent and the standards set forth therein, not older federal court decisions, we look to *Street* and *Love*, not *Ziegenhagen*. *See State v. Mechtel*, 176 Wis. 2d 87, 95, 499 N.W.2d 662 (1993) ("State courts are not bound by the decisions of the federal circuit courts of appeal or federal district courts."); *see also Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) (holding that our court of appeals is bound by prior Wisconsin Supreme Court and Court of Appeals decisions).

the case. *Id.* at 79, 82. Nonetheless, the court determined that Love had not established a violation of his Sixth Amendment right to the effective assistance of counsel in large part because counsel had no recollection during her representation of Love of having previously served as a prosecutor at his original sentencing.[6] *Id.* at 82-84.

¶21 In *Street*, we considered a situation in which Street's criminal counsel was also serving as divorce counsel for the lead detective in the case against Street. *Street*, 202 Wis. 2d at 538-39. In addition to investigating the case, the detective also testified against Street for the State and sat with the prosecutor at counsel table throughout Street's trial. *Id.* at 543. The evidence from the postconviction hearing on Street's subsequent ineffective assistance of counsel challenge established that counsel was aware the detective was the investigating officer in the case, had discussed this with both Street and the detective, but did not obtain written consent to represent both at the same time. *Id.* at 538-39.

¶22 We concluded that an actual conflict of interest existed because of the financial pressure on counsel, noting that counsel "does not want to lose a client whether that client is seeking advice on a civil or criminal matter." *Id.* at 543. Citing to the relevant Wisconsin Supreme Court Rule, we stated that "[a] lawyer's duty of loyalty to his or her client and to promote the client's interests exists in both the civil and criminal contexts." *Id.* We further noted that Street and the detective were "adversaries," adding that "[t]he interests of Street and [the detective] were

---

[6] The *Love* court noted that while serving as a prosecutor at Love's original sentencing, Love's counsel "made only two brief appearances for the State, was handed the case file a mere 15 minutes before the sentencing hearing, and could not remember her prior involvement" in the case. *Love*, 227 Wis. 2d at 65-66, 78. In the case now before us, Parise presided as court commissioner over only the one hearing, which, based upon the four-and-one-half-pages-long transcript, could not have lasted more than a few minutes. And Parise, like Love's counsel, had no recollection of his previous involvement in Henyard's case in another role.

divergent"—"Street desired an acquittal and [the detective] had an interest in a conviction." *Id.*

¶23 Despite the actual conflict of interest, we found no Sixth Amendment violation because Street had "[failed to] demonstrate[] by clear and convincing evidence that the conflict adversely affected" counsel's representation. *Id.* at 543-44; *see also* **State v. Owen**, 202 Wis. 2d 620, 639, 551 N.W.2d 50 (Ct. App. 1996) ("An actual conflict of interest exists *only when* the attorney's advocacy is *somehow adversely affected by the competing loyalties*.") (emphasis added). While Street complained of counsel's failure to impeach the detective, challenge the detective's interviewing techniques, or use the detective's report to impeach the victim-witnesses in the case, we concluded Street failed to identify any strategic basis for counsel to have taken such actions. **Street**, 202 Wis. 2d at 544. Related to counsel's failure to impeach the victim-witnesses, we also added that "we fail to see how [counsel's] decision not to … impeach the [witnesses] could have been motivated by his desire to keep [the detective] as a client in the divorce case [as this] would not have called [the detective's] integrity or competence into question." *Id.*

¶24 We also addressed an argument by Street that a pretrial decision by counsel to permit the detective to accompany Street alone to Chicago for a polygraph test "demonstrate[d] that an actual conflict adversely affected his representation." *Id.* We determined that "[t]here [wa]s no basis to conclude that [counsel's] decision, even if it were professionally unreasonable, can be attributed to loyalty to [the detective]. [Counsel] testified at the hearing that the reason he did not go to Chicago was that he was busy working on other cases, and nothing in the record controverts this." *Id.* at 544-45.

13

¶25 Like Love and Street, Henyard has failed to show that Parise had an actual conflict of interest that adversely affected his representation. Henyard complains that Parise advised him to accept a plea deal, did not meet with him a sufficient number of times, and did not adequately discuss with him possible defenses or mitigating factors.[7] But fatal to Henyard's complaints is his failure to show how anything Parise did or failed to do could have been due to Parise having earlier presided over Henyard's preliminary hearing waiver, made a probable cause finding against Henyard, and bound him over for trial, when Parise was unaware he had done any of these things. Henyard has provided no factual basis for us to otherwise conclude that Parise's act of presiding over the December 2016 hearing in any way compromised his representation of Henyard.[8] As a result, Henyard's ineffective assistance of counsel claim fails as does his related motion for plea withdrawal.[9]

---

[7] We note that when the circuit court asked Henyard during the plea colloquy if he was satisfied with the representation Parise had provided him, Henyard responded, "Oh, yes."

[8] Although Henyard argues that Parise had a conflict of interest which was "not waivable," we need not address the question of waiver because Henyard has not shown in the first instance an actual conflict of interest that adversely affected Parise's performance as counsel. See *Street*, 202 Wis. 2d at 545 & n.7 (holding that because Street failed to establish "that the actual conflict of interest adversely affected his lawyer's representation," it was "unnecessary to address the State's claim that Street waived his right to conflict-free representation").

[9] While we agree with the Dissent that Parise's representation of Henyard raises serious institutional concerns, the Dissent offers no facts to show that the representation was adversely affected. Rather, the Dissent first questions the circuit court's conclusion that the representation was the result of an unknowing "mistake," with no showing that the court's decision was based on factual findings that were clearly erroneous. And while Parise's prior service in the role of court commissioner requires our exacting scrutiny, the Dissent effectively ignores the requirement that we review the potential conflict under an ineffective assistance of counsel framework, including considering whether the representation was adversely affected. Ultimately, the Dissent instead opts to rely solely upon valid public policy concerns, that Parise served as a court commissioner in Henyard's case and then represented him in the same case, to conclude that this case presents an actual conflict with prejudice established as a matter of law. Until our supreme court concludes that it does not matter whether or not the representation was adversely affected, we must follow the law as it stands. *Cook*, 208 Wis. 2d at 189-90.

Judicial Bias at Sentencing

¶26   A judge is presumed to have "acted fairly, impartially, and without prejudice." *State v. Herrmann*, 2015 WI 84, ¶3, 364 Wis. 2d 336, 867 N.W.2d 772. When a defendant shows there is actual bias by a judge or "the appearance of bias reveals a great risk of actual bias, the presumption of impartiality is rebutted, and a due process violation occurs." *Id.*, ¶46. Whether a judge was objectively biased is a question of law we review de novo. *Id.*, ¶23.

¶27   Henyard claims Schroeder is biased against defendants, like Henyard, who are convicted of delivering heroin and other drugs and "pre-judg[ed]" his sentence. He points to the local newspaper articles which discuss sentencing comments Schroeder made in other cases. The articles identify Schroeder as stating that people who commit the "grave crime" of first-degree reckless homicide for delivering drugs which caused someone's death "have to suffer severe loss," "the key to addressing the growing opiate problem—and drug problems in general—is to put more people in prison," "the war on drugs needs to be fought more aggressively," and "I pray to God that it will and that lives will be saved"; indicating he "believed that long prison sentences can deter others from selling heroin"; and showing admiration for the effectiveness of Singapore's policy of applying the death penalty to drug dealers. Deneen Smith, *Judge Hopes Stiff Sentence Can Deter Opioid Abuse*, KENOSHA NEWS (Mar. 18, 2018), https://www.kenoshanews.com/news/local/judge-hopes-stiff-sentence-can-deter-opioid-abuse/article_792fec61-4778-515b-84a0-9cca35d1bab7.html; Deneen Smith, *12 Year Prison Sentence for Man Connected to Drug Overdose Death*, KENOSHA NEWS (July 21, 2017), https://www.kenoshanews.com/news/local/12-year-prison-sentence-for-man-connected-to-drug-overdose-death/article_945d95f9-d87b-5294-a309-3b520e1a6777.html. From this Henyard

asserts that Schroeder's position "on every drug delivery case" is "eminently clear." Henyard further points to the August 7, 2017 hearing at which Schroeder increased his bond due in part to the "recent publicity about [Schroeder's] thoughts about dealing heroin" and Schroeder's concern that these thoughts "would give [Henyard] an additional incentive to fail to appear." Henyard claims Schroeder's comments "give not only the appearance of bias" but amount to "actual bias" and argues that "it is clear from the Court's comments during Mr. Henyard's [August 7] hearing ... that the court would act consistent[] with its personal desire to sentence drug offenders to lengthy prison sentences, especially those who are dealing with heroin like Henyard."[10]

¶28 The State insists Henyard has failed to overcome the presumption that Schroeder is unbiased. It asserts that Henyard has presented no evidence of bias, prejudgment, or unfair treatment "in his specific case" and "there is no appearance of bias because a reasonable person would not question Judge Schroeder's impartiality." We agree.

¶29 In his ruling on Henyard's postconviction motion, Schroeder correctly pointed out that in sentencing defendants, judges are "required to state the reasons which justify the sentence." *See State v. Gallion*, 2004 WI 42, 270 Wis. 2d 535, 678 N.W.2d 197. He explained that in those cases addressed in the newspaper articles "[r]eference can be made to the sentence transcripts … which note that the primary justification in each case was to send a message to the then-present defendant, his friends and acquaintances, and the community at large that I do believe that stern sentences save lives." Schroeder expressed that "[t]here was no

---

[10] We note that Henyard did not challenge the circuit court's bond decision, addressing these comments only in the context of subsequent sentencing.

prejudgment of the outcome of Mr. Henyard's case, but only general statements of the gravity of certain law violations."

¶30    Schroeder's comments as reported in the newspaper articles—which comments were similar to comments he made at Henyard's own sentencing—were general statements on his view of the gravity of the crime of delivering heroin and other drugs and the importance of protecting the public by deterring future crimes of this nature.  This is no different than the expressions heard every day by courts throughout the country that murders, rapes, child molestations, etc., are some of the most serious crimes and warrant stern sentences.  Our supreme court has stated that protection of the public and future deterrence of those who would contemplate committing similar crimes are key factors a court should consider in meting out a sentence.  *See, e.g.*, **Herrmann**, 364 Wis. 2d 336, ¶61.

> As the judge's statements addressed the seriousness of the crime and the need to deter drunk driving, they were consistent with the requirements placed on judges to discuss the objectives of the sentence.  This court explained in ***State v. Gallion***, 2004 WI 42, ¶40, 270 Wis. 2d 535, 678 N.W.2d 197, that "[c]ircuit courts are required to specify the objectives of the sentence on the record.  These objectives include, but are not limited to, the protection of the community, punishment of the defendant, rehabilitation of the defendant, and deterrence to others."

**Herrmann**, 364 Wis. 2d 336, ¶61.

¶31    At Henyard's own sentencing hearing, Schroeder considered the significance of Henyard's repeated crimes of delivering heroin and cocaine; Henyard's character in that he also had $80,000 in child support arrearage and a significant criminal record, including a history of being a "woman beater"; and the need to protect the public by deterring Henyard and others who would consider

delivering illegal drugs. In sentencing Henyard as he did,[11] including making the comments he made, Schroeder acted in a manner consistent with *Gallion* and *Herrmann*.

¶32 While Henyard points us to the case of *State v. Goodson*, 2009 WI App 107, 320 Wis. 2d 166, 771 N.W.2d 385, it is inapposite. In *Goodson*, the judge had told Goodson at sentencing that if he violated the rules of extended supervision, he "w[ould] be given the maximum, period." *Id.*, ¶2. Following Goodson's reconfinement hearing for violating his supervision rules, the court did indeed sentence him to "the maximum." *Id.*, ¶5. We found the sentencing judge to have been objectively biased at the reconfinement hearing because a reasonable person would conclude that the judge had "made up his mind" about Goodson's sentence before that hearing. *Id.*, ¶13.

¶33 This case is not like *Goodson*. With his comments as reported in the newspaper articles, Schroeder expressed his general belief as to the importance of deterring drug dealing in order to protect the public. He made no prejudgment as to, or even commented about, Henyard's case, and he certainly made no presentencing promise of a specific sentence he would hand down against Henyard. Our supreme court correctly expressed in *Herrmann* that there is no actual bias or great risk of bias, and hence no due process violation, where a judge merely "addresse[s] the seriousness of [a] crime and the need to deter" that crime. *Herrmann*, 364 Wis. 2d 336, ¶61. Again, that is all Schroeder did both at the

---

[11] On all four charges to which Henyard pled, the circuit court could have sentenced him to sixty-seven and one-half years. The court instead sentenced him to seventeen years on one count—twelve years of initial confinement followed by five years of extended supervision—and withheld sentence and ordered six years of probation on the other counts.

sentencing hearings referred to in the newspaper articles and Henyard's own sentencing hearing.

¶34     Trying to connect Schroeder's general comments at the sentencing hearings of others to Henyard's specific case, Henyard points to Schroeder's comment at the August 7, 2017 hearing in this case, in which Schroeder explained why he was increasing Henyard's bond following the filing of new charges. Schroeder stated he had considered the fact that Henyard had, to that point, a good record of making his court appearances in the case, but explained he was nonetheless increasing Henyard's bond because

> I'm faced with the fact that he has a history of convictions for violence, although they have been reduced in stature by the district attorney, but he has gone down on convictions for personal violence against women before, and he is accused now while he was out on bond in this case of threatening to kill a woman and battering her and I think breaking a couple of bones, and so I'm very uncomfortable with that, given the severity of the charges, and *there has been some recent publicity about my thoughts about dealing heroin, too, so that … would give the defendant an additional incentive to fail to appear ….*

(Emphasis added.)

¶35     Henyard claims Schroeder's above-italicized comment, when coupled with his comments reported in the newspaper, amount to "pre-judging Mr. Henyard's case ... namely, that a lengthy prison sentence is appropriate in Henyard's case, not unlike those that were publicized." But, as Schroeder pointed out at the postconviction hearing, this very brief comment gave no indication as to what Schroeder would do in sentencing Henyard. First, the comment is an explanation of Schroeder's concern as to what *Henyard* might think and how *he* might act related to fear of a stern sentence; it is not a comment as to what Schroeder planned to do at sentencing. Second, ***Goodson*** shows that there must be much more

19

specificity than general comments about viewing certain crimes as deserving of stern sentences, such as the general comments attributed to Schroeder in the newspaper articles. Rather, there must be comments that amount to an actual promise to order a specific sentence. Schroeder made no such comments. Even with Schroeder's comment at the August 7 hearing, there is simply nothing in the record that suggests Schroeder had prejudged a sentence for Henyard.

¶36 Henyard has failed to meet his burden of convincing us that Schroeder was either actually biased in sentencing him or that there existed a "great risk of actual bias" that established the appearance of bias. *See **Herrmann***, 364 Wis. 2d 336, ¶46. As a result, he has failed to rebut the presumption that Schroeder was fair, impartial and without prejudice.

*By the Court.*—Judgment and order affirmed.

No.    2019AP548-CR(D)

¶37    REILLY, P.J. (*dissenting*).    Court Commissioner Frank Parise bound Keith Henyard into the criminal justice system and then sold his legal services to Henyard as the one who could get him out.    Our supreme court prohibits a court commissioner[1] from engaging in any financial or business dealings that could "[r]easonably be perceived to exploit the judge's judicial position," SCR 60.05(4)(a)1.a., and, as relevant to this case, directs that a lawyer "shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer," SCR 20:1.12(a).    The comment to SCR 20:1.12(a) provides that the conflict created thereby "is not subject to waiver by consent of the parties involved."    As Parise violated SCR 20:1.12(a) and Henyard cannot waive the conflict Parise created, an actual conflict of interest and prejudice exists requiring automatic reversal.    Accordingly, I respectfully dissent.

¶38    A defendant has a constitutional right to the effective assistance of counsel, and "[w]here a constitutional right to counsel exists, there is a correlative right to representation that is free from conflicts of interest."    *State v. Street*, 202 Wis. 2d 533, 541, 551 N.W.2d 830 (Ct. App. 1996).    "In order to establish a Sixth Amendment violation on the basis of a conflict of interest, a defendant who did not raise an objection at trial must demonstrate by clear and convincing evidence that his or her counsel had an actual conflict of interest and that the actual conflict of

---

[1] WISCONSIN STAT. § 19.45(11)(c) provides that our supreme court "shall" promulgate a code of judicial ethics, which all judges "shall" adhere to.    WISCONSIN STAT. § 757.68(1) provides that Supreme Court Rules govern court commissioners, and SCR 60.01(8) provides that a court commissioner is a "judge" under our code of ethics.

interest adversely affected his or her lawyer's performance." *Street*, 202 Wis. 2d at 542. The defendant, however, is not required to establish the "full showing of prejudice usually required under [*Strickland v. Washington*, 466 U.S. 668, (1984)]—that it is more likely than not that the outcome of the proceeding would have been different had the attorney acted properly." *Street*, 202 Wis. 2d at 542.

> In [*Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980)], the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts … it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Strickland*, 466 U.S. at 692 (citation omitted).

¶39 "Determining what constitutes an actual conflict of interest must be resolved by looking at the facts of the case." *State v. Love*, 227 Wis. 2d 60, 71, 594 N.W.2d 806 (1999). Henyard was charged in an eight-count complaint subjecting him to 157 years of imprisonment. The probable cause portion of the complaint, which Parise reviewed to bind over Henyard, described the eight criminal acts Henyard allegedly committed and included the vehicle descriptions, the buy amounts, the location of the crimes, the people present, and details of the police stop. Henyard appeared before Parise on December 28, 2016, for his preliminary hearing.[2] Attorney Jonathan Smith appeared with and on behalf of Henyard. Parise first engaged Henyard and Smith regarding Henyard's desire to waive his right to a

---

[2] A preliminary hearing (examination) tests whether probable cause exists that a felony was committed by the defendant. WIS. STAT. § 970.03(1). In multiple count complaints, the court must examine each count and make a finding that probable cause exists for each count. Sec. 970.03(10).

preliminary hearing. Parise informed Henyard: "The preliminary hearing is where the State has to convince me that you may have participated in or committed a felony or felonies; do you understand that?" Parise then engaged Henyard in a full colloquy, and ultimately found that "I am satisfied that Mr. Henyard has freely, voluntarily, and intelligently waived his right to a preliminary hearing. I am satisfied further that I have reviewed the complaint and that there is probable cause to bind this matter over for trial."

¶40 Five months later, on May 22, 2017, Parise and Henyard "talked."[3] Henyard went to Parise's office three days later, on May 25, 2017, and then again on May 26, 2017, where he "physically" gave Parise money. Parise testified that he did a conflicts check, which showed the conflict, but "I didn't catch it." Parise claimed no recollection of Henyard, Smith, or the details of Henyard's eight crimes having been before him five months earlier. Parise testified that Henyard hired him "to cut a better deal."

¶41 Even if one believes Parise's memory loss, a reasonable court commissioner/judge would have known of the conflict. It strains credibility that Parise, after speaking and meeting with Henyard multiple times, reviewing the complaint and discovery, speaking with Smith, and performing a conflicts check which showed the actual conflict, claims no memory of presiding as court commissioner five months earlier in the same case. The fact that Parise "missed it" when he read his conflict checks does not cleanse the actual conflict that exists.

---

[3] The parties at the postconviction hearing did not explore the details of how, why, and where Parise and Henyard "talked" on May 22. Neither Smith nor Henyard were called to explain the reasons for Henyard's switch to Parise.

3

¶42     The circumstances in this case are very different than those in **Street** or **Love**.  **Love** involved serial representation, which "occurs when an attorney represents one party in a case, then switches sides to represent the other party in the same proceeding or in an unrelated case." **Love**, 227 Wis. 2d at 73.  Similarly, **Street** involved simultaneous representation of individuals with divergent interests.  **Street**, 202 Wis. 2d at 543.  Neither of these cases address the issue before this court—a conflict of interest involving a judge.

¶43     Unlike **Love**, where defense counsel appeared as the prosecutor and then advocated for the defendant twenty months later, **Love**, 227 Wis. 2d at 78, Parise had a much different and significant role—the role of judge—a role that cannot change during the game.  Under no circumstances should we allow an individual to serve as both judge and attorney in the same case.  A judge's role must be protected from any suggestion of impropriety to protect the integrity of the judicial process.[4]  Parise bound Henyard into the criminal justice system and then sold his legal services to Henyard as the defense lawyer who could get him out.  *See id.* at 75-76 ("Determining whether an attorney has an actual conflict involves a

---

[4] In **State v. Miller**, 160 Wis. 2d 646, 653, 467 N.W.2d 118 (1991), our supreme court recognized that "[a]n actual conflict or serious potential for conflict of interest imperils the accused's right to adequate representation and jeopardizes the integrity of the adversarial trial process and the prospect of a fair trial with a just, reliable result."  The court explained,

> The United States Supreme Court enumerated three institutional interests that are jeopardized by a criminal defense attorney who has an actual or serious potential conflict of interest: First, a court's institutional interest in ensuring that "criminal trials are conducted within the ethical standards of the profession." Second, a court's institutional interest in ensuring that "legal proceedings appear fair to all who observe them." Third, a court's institutional interest that the court's "judgments remain intact on appeal" and be free from future attacks over the adequacy of the waiver or fairness of the proceedings.

*Id.* at 653 n.2 (citations omitted).

closer examination of the facts of each particular case, with a particular eye to whether the attorney will, in the present case, be required to undermine, criticize, or attack his or her own work product from the previous case." (citation omitted)). Parise's violation of a Supreme Court Rule created an actual conflict of interest that adversely affected his performance, and prejudice is presumed.

¶44 The Majority errs in concluding that an actual conflict of interest did not exist. Majority, ¶19. My discussion above cannot be clearer: a judge who makes a substantive ruling and then sells his services as a defense lawyer to the defendant he just presided over has created an actual conflict. Our supreme court says so via its rules of ethics. The Majority asserts that I offer no facts to show that Henyard's representation was adversely affected. Majority, ¶25 n.9. Again, the Majority is mistaken as I choose to focus on the key fact that Parise sold himself to Henyard as the one who could "cut a better deal." Parise had no control over what the sentencing judge was going to do, but he implied that he did. Parise's violation of SCR 20:1.12(a) cannot be waived, which means that it adversely affected Henyard; the judiciary; and the independence, impartiality, and integrity of our judicial system. Parise's violation of the integrity of our judicial system is an act that "adversely affected" Henyard's representation.

¶45 My concern lies with a judiciary that obscures errors and ignores violations meant to protect defendants and the integrity of the judicial system by creating ever-expanding rules of harmless error, lack of prejudice, lack of adversely affected representation, waiver, and forfeiture that we apply on a daily basis to avoid answering for our wrongs or the wrongs of the government. We shade our mistakes by imposing the burden of proof upon the one whose only wrong was being the recipient of our bad acts. We must have the fortitude to admit that we are the wrong-

5

doers in this case, and we must have the integrity to accept the blame rather than force the one who did not err to prove that our mistake did not hurt him.

¶46    Where an actual conflict of interest that cannot be waived exists, we must presume not only that the lawyer's performance was prejudicial but also that it adversely affected the defendant's representation. An actual conflict of interest always adversely affects the lawyer's performance. I do not accept that *Cook v. Cook*, 208 Wis. 2d 166, 560 N.W.2d 246 (1997), controls this answer, but if the Majority is correct that *Cook* does control, then the system is broken and we broke it. Honesty and integrity should prevail over avoidance.

¶47    The State has shown no prejudice to beginning this case anew. Henyard could not consent to Parise's wrongdoing, and neither should we. Public confidence in the integrity, independence, and impartiality of the judiciary has been challenged enough. We can fix our wrongs in this case, and we should do so. I respectfully dissent.